BRADESKU, APPELLEE, *v.* ANTION, APPELLANT, ET AL.
BRADESKU, APPELLEE, *v.* ARMSTRONG, APPELLANT, ET AL.
BRADESKU, APPELLEE, *v.* RADIO CHURCH OF GOD, APPELLANT,
ET AL.
BRADESKU, APPELLEE, *v.* AMBASSADOR COLLEGE, APPELLANT,
ET AL.

(Nos. 6203, 6204, 6205 and 6206—Decided March 26, 1969.)

*Mr. Harvey H. Starkoff*, for appellee.
*Messrs. Arter, Hadden, Wykoff & Van Duzer* and *Mr. Edward C. Crouch*, for appellants.

HUNSICKER, P. J. This is an appeal on questions of law in four separate appeals from four judgments, against separate defendants, rendered in a single trial held in the Court of Common Pleas of Summit County.

The plaintiff, Melvin D. Bradesku (appellee here), a divorced man with one child, married Isabel Bradesku, and, from that marriage, five children were born. The parties were members of the Pearl Road Methodist Church, located in Cleveland, Ohio, where they lived. The marriage had a normal uneventful course, with some differences of opinions and some quarrels. It appears that Mrs. Bradesku began to question her relationship with her husband, especially after listening to a daily radio program sent out on the air waves from Pasadena, California, by one of the defendants, the Radio Church of God (an appellant here). Herbert W. Armstrong, one of the defendants (an appellant here), is the founder of this church and its senior pastor. Another defendant is Ambassador College (an appellant here), located in Pasadena, which is a theological school operated by the Radio Church of God.

The Radio Church of God is a conservative fundamentalist organization that says it accepts, without qualification, the King James version of the Bible as the unchangeable word of God. It may have listeners but has a small number of members, perhaps 300,000. It also broadcasts to many countries outside the United States. It claims to have churches in other countries. One of the firm beliefs of this church is a literal acceptance of the 19th Chapter of the Gospel according to Saint Matthew, where Jesus said that "* * * whosoever shall put away his wife, except it be for fornication, and shall marry an-

other, committeth adultery: and whoso marrieth her which is put away doth commit adultery."

Mrs. Bradesku, attracted by the radio program, wrote to the church in Pasadena, asking for some of the free publications offered to the radio listeners. She received a reply to her inquiry, and then learned that there was a church of that denomination in Akron, Ohio, with a minister. This minister is David L. Antion, the fourth defendant (appellant) in this case. Mr. Antion is not listed in the directory; the church does no advertising, nor does it distribute its literature, except upon written request to the church in Pasadena, California.

The request of Mrs. Bradesku for literature and, later, for advice concerning her marriage, was referred by the parent church to Mr. Antion, who sent her a letter as follows:

"Thank you for your letter of April 5. You asked about what God's decision would be in your marital case seeing that your husband had been married before.

"As you know, Jesus said, 'What therefore God hath joined together, let not man put asunder.' Also, Whosoever shall put away his wife, and marry another, committeth adultery against her. And if a woman shall put away her husband, and be married to another, she committeth adultery.'

"Thus God's principle is: Once he binds us to a mate we have no right to divorce and REMARRY. Your present 'husband,' Mr. Bradesku was married before according to what you have told me. According to the Bible he is bound to his first wife and therefore, according to Jesus Christ he is not free to remarry. In God's eyes and according to the Bible the present state would be adulterous.

"We do not involve ourselves in the legal aspect of this situation but only preach God's Word as Jesus commanded us to do. Now it is up to you what you will do about this situation. You mentioned in your letter of April 5 that you might 'leave quickly and without his [Mr. Bradesku's] knowledge.'

"Our prayer is that you will obey God and continue to

serve Him 'with all your heart, with all your mind and with all your soul.' If we can be of further help in answering your questions from the standpoint of the Bible, please call on us. Sorry for the delay in this answer.''

The Bradesku family came to Akron at least once to attend the Akron church. Mrs. Bradesku, at least once, talked over with Mr. Antion the thoughts she had about her marriage to a divorced man. He told her the beliefs held by the Radio Church of God. She determined to become a member after some time had elapsed. She accepted the beliefs of the church which held Easter, Christmas, and other holy days, and birthdays, to be pagan superstitions. These beliefs, and the dietary laws of the church, such as abstinence from pork, and seafood without scales, caused a family crisis. She sued for divorce but, later, dismissed that action and tried living with her husband, but not as his wife. Later, she left home and refiled for divorce. An action is pending. She insists she left not alone for the religious belief set out by Radio Church of God, and the statements contained in the letter from Mr. Antion, but because of abuse and misconduct toward her by Mr. Bradesku. He had once been convicted of an assault and battery upon her.

Mr. Bradesku says the home of the parties was destroyed, and the affection of his wife alienated, by the doctrine preached by this church, and by the advice, counsel and acts of these defendants (appellants).

Certain literature was sent to Mrs. Bradesku by way of a form letter signed by Herbert W. Armstrong and/or Ambassador College. The college printed a magazine, The Plain Truth, under the auspices of the church. This magazine commented on church beliefs and, at times, was critical of the beliefs or practices of other religions. It is uncontroverted that all oral conversation on the specific problem which disturbed Mrs. Bradesku was carried on by Mr. Antion, who received his pay, and direction where to preach or counsel, from the head office in Pasadena. The only contact Mrs. Bradesku had with the Radio Church of God was listening to its broadcasts. The only contact

she had with Herbert W. Armstrong, and Ambassador College, was to receive the magazine, The Plain Truth, some church literature, and a pamphlet concerning the belief of the church on marriage and the status of the marriage of divorced persons. This pamphlet more fully set out what Mr. Antion wrote in the letter which he sent to Mrs. Bradesku in response to her first inquiry, after hearing the broadcasts, or receiving literature from the church headquarters in Pasadena, California.

A trial of the action resulted in four separate verdicts returned by a jury, in favor of the plaintiff, and, from the judgments rendered thereon, four separate appeals are lodged in this court, which, as we said at the beginning, are being considered together.

The assignments of error are identical and very lengthy in each appeal, but the claimed errors say that: the judgments are contrary to law; the evidence is insufficient to sustain a verdict for the plaintiff; the judgments contravene the Constitution of the United States and the Constitution of the state of Ohio; the trial court admitted extraneous and prejudicial evidence; the instruction to the jury, with respect to Section 2905.42, Revised Code, was improper; the admission of plaintiff's exhibit 2 was improper; the court improperly overruled the separate motions for judgment notwithstanding the verdicts; and the judgments are against the manifest weight of the evidence.

Counsel say they have found no case with a similar factual basis in their search of Ohio case law. We, too, have been unable to discover a case similar to that now before us. We have in Ohio many cases wherein the elements for a claim of alienation of affections have been set out; some of them have been pronounced by this court.

Two members of this court, sitting by designation on the Eighth District Court of Appeals, quoted with approval in an alienation of affections action III Restatement of the Law of Torts 475, Section 684:

"One who, without a privilege to do so and for the purpose of disrupting the marriage relation, induces a wife

to separate from her husband or not to return to him after she has separated from him, is liable to the husband for the harm thereby caused to any of his legally protected marital interests.''

See: *Stefancik* v. *Kuhns*, 58 Ohio Law Abs. 400.

In the case of *Lewis* v. *Bauer*, 93 Ohio Law Abs. 457, Collier, J., speaking for the Court of Appeals of the Fourth District, said:

''* * * in order to establish a prima facie case [of alienation of affections] the plaintiff [must] * * * prove that the defendant *wrongfully, maliciously and intentionally enticed, induced, persuaded and caused* plaintiff's husband to lose his affections for her; * * *.'' (Emphasis ours.)

There is an annotation on the subject of causation in alienation-of-affection actions in 19 A. L. R. 2d 471, with a collation of many authorities from forty-four of the states. The general rule is there said to be—''In order to justify recovery in an action for alienation of affections, it must appear that the defendant's *wrongful* conduct caused the alienation or separation.'' (Emphasis ours.)

As we examine the evidence in this case, the only acts committed by Herbert W. Armstrong, Ambassador College, and Radio Church of God, consisted in publishing their religious beliefs by means of pamphlets, and by means of radio broadcasts. Neither Mr. nor Mrs. Bradesku had any personal contact with Herbert W. Armstrong and Ambassador College. They heard the radio broacasts which could be turned off at any time they desired. Mrs. Bradesku, of her own volition, wrote to the Pasadena headquarters of Radio Church of God for the free literature which they offered over the radio. The evidence establishes that no one from this church first sought out Mrs. Bradesku or called on her. The church does not and none of its members contact persons interested in the religion, unless such persons first make a request for information about the religion to the headquarters in Pasadena. There is no proselytizing, in the usual connotation of that word, until after contact is made with the headquarters in Pasadena,

and then it is a voluntary act on the part of the one seeking information to make the first call. There is no compulsion for a prospective believer, as was Mrs. Bradesku, to accept the doctrine advocated by the church.

One of the most cherished freedoms of the citizens of this country is religious freedom. It is a freedom to believe, or not to believe, in matters religious. The federal and state governments must keep their hands off the religious beliefs of citizens, and not abridge "freedom of speech or of the press; * * *."

The extent to which our courts go, in protecting what to many is reprehensible conduct, may be found in *Cincinnati* v. *Black*, 8 Ohio App. 2d 143, where that court said:

"An ordinance which makes it a crime to sell, offer for sale or give away 'any pamphlet or paper which contains an article or articles subjecting to ridicule or contempt any class or group of citizens on account of' 'race or religious belief, or which in any manner tends to promote racial hatred or religious bigotry,' is an unconstitutional invasion of the freedoms of speech and press, religion and assembly guaranteed by the Ohio and United States Constitutions."

See, also: *State* v. *McLaughlin*, 4 Ohio App. 2d 327; *Terminiello* v. *Chicago*, 337 U. S. 1.

The right to advocate and to disseminate any religious faith, no matter how offensive or ridiculous to others, short of a faith dedicated to the overthrow of the government by force, is guaranteed by the Constitution of the United States, and is binding on the states. See: *School District of Abington* v. *Schempp*, 374 U. S. 203.

The Supreme Court of the United States, in *Cantwell* v. *Connecticut*, 310 U. S. 296, at 310, said:

"In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation

have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of democracy."

See, also: *New York Times Co.* v. *Sullivan*, 376 U. S. 254; 16 American Jurisprudence 2d 645 *et seq.*, Constitutional Law, Section 336 *et seq.*

There can be no question that the defendants (appellants herein) were, when publishing or broadcasting their religious views, well within their constitutional rights and, hence, not engaging in a wrongful or in an unlawful act. If, then, these acts were not unlawful, they cannot be the basis for an action for alienation of affections.

Let us, then, examine the conduct of Mr. Antion. In addition to passing out some literature, he preached, wrote a letter expounding the views of his religion concerning divorce and remarriage, and he talked with Mrs. Bradesku one or more times. Except as the letter is claimed to be an intent to separate Mr. and Mrs. Bradesku, there is not one iota of evidence to show that he "wrongfully, maliciously, and intentionally enticed, induced, persuaded, and caused" Mrs. Bradesku to leave her husband. After the receipt of the letter, and her talk with Mr. Antion, the Bradeskus continued, for a period of time, to live together as man and wife.

It would be an unusual stretch of the imagination to say that, on the strength of the letter from Mr. Antion, which is in evidence here, Mrs. Bradesku, a mature and reasonably normal person, would consider the contents of such letter as an enticement or inducement to leave her husband, the father of her five children. The writing of the letter was not wrongful conduct so as to make it a basis of action for alienation of affections.

It seems apparent to this court that the conduct of Mrs. Bradesku was the result of something other than the teaching of the Radio Church of God.

What we have said heretofore with reference to the lack of evidence to show that the defendants (appellants) enticed or induced the separation of the parties applies

also to the claim that the wrongful act necessary to this action may be found in a violation of Section 2905.42, Revised Code. There is no evidence of intent to cause a separation in the case before us, and what is more important is that the statute does not extend to a person delivering a public sermon, exhortation or address. We do not believe all these methods of communication need be oral.

There is one other matter which we believe should be commented upon, and that is the introduction into evidence of, first, the failure of Mr. Antion to secure a license to perform a marriage ceremony, and, second, the belief of the church that a birthday and a holy day celebration is a pagan custom and, hence, is not observed by this religious organization. This evidence in this alienation-of-affections case had no bearing on any of the elements of that action, and could only have been introduced for the purpose of ridiculing a religious practice substantially different from the prevailing culture of this community; it tended to excite emotions and brought nothing to the substance of the action. It was thus error to permit its admission, where objection on the part of defense counsel was made.

It is the conclusion of this court, after a review of the authorities, and a study of the evidence, that the judgments of the Court of Common Pleas of Summit County, entered on all four of the verdicts, shall be, and hereby are, reversed as being contrary to law, and final judgment is rendered for each one of the defendants (appellants) in this action.

> *Judgments reversed and final judgments for defendants.*

DOYLE and BRENNEMAN, JJ., concur.